## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAUL C. CZYSZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Civil Action No.<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, by the undersigned attorneys, individually and on behalf of all others similarly situated, alleges upon personal knowledge as to plaintiff, and as to all other matters upon information and belief based on, *inter alia*, the investigation made by plaintiff's attorneys, which included among other things, a review of publicly available information, of the complaint filed in the United States District Court, District of Delaware, styled *AMD v. Intel Corporation, et al.*, and of news reports of the proceedings before the Japanese Fair Trade Commission ("JFTC")[1], alleges as follows:

## NATURE OF THE ACTION

1.    This action arises from the anticompetitive and monopolistic practices engaged in by Defendant Intel Corporation ("Intel") in the trade or commerce of microprocessors. Specifically, Intel intended to, did, and continues to prevent and destroy competition, acquire and/or maintain monopoly power, and raise prices of microprocessors to supra-competitive levels in the United States and worldwide by engaging in the following unlawful activities:

---

[1]    Japanese Fair Trade Commission, *The JFTC Rendered a Recommendation to Intel K.K.,* (March 8, 2005)    <http://www.jftc.go.jp/e-page/pressreleases/index05.html> is attached as Exhibit A.

A. Coercing strategic customers into exclusive or virtually exclusive agreements to purchase Intel microprocessors;

B. Threatening strategic customers with the loss of rebates, allowances and market development funding if they did not limit or abandon purchases of competitor products, such as the microprocessors developed by Advanced Micro Devices, Inc. ("AMD");

C. Instituting a retroactive rebate program to induce customers to purchase of elevated levels of Intel microprocessors to the exclusion of competing products manufactured by AMD or others; and

D. Establishing and strictly enforcing quotas with retailers, requiring them to purchase unnecessarily high numbers of Intel microprocessor based PC platforms to the exclusion or near exclusion of competing platforms based on AMD or other microprocessors.

2.    Beginning in the mid-1970s, Defendant Intel has dominated and monopolized the microprocessor market worldwide.

3.    Since 1997, Intel market share of worldwide sales of PCs has exceeded 80%.[1] Intel engaged, and continues to engage, in a series of predatory acts designed to eliminate competition in, and prevent entry into the microprocessor market, exclude competitors from gaining significant market share, and maintain its monopoly position. Competitors such as AMD, offering technically superior products and/or lower prices, were and are not able to gain sufficient market penetration because of Intel's unlawful conduct. This behavior has enabled Intel to avoid any significant competition in the microprocessor market.

4.    Intel has used the exclusionary practices to maintain its monopoly power, which has resulted in injury to consumers, primarily in the form of supra-competitive prices for

---

[1] The lone exception was in 2001 when Intel's market share was 78.7%. The following year it bounced back to approximately 83.6%.

2

microprocessors, which, in turn, raises the prices of PCs purchased by consumers, and secondarily in the form of reduced consumer choice.

5.    Plaintiff, on his own behalf and on behalf of the class defined below, brings this action for civil damages and injunctive relief.  Plaintiff demands a jury trial.

## DEFINITIONS

6.    The term "PC" refers to computers used for home or business.

7.    The term "microprocessor" is the central processing unit of a PC.

8.    The term "x86 microprocessors" refers to Intel's family of Pentium microprocessors or compatible microprocessors.  Intel's x86 microprocessor products include a family of devices that have been marketed and sold under the trade names 8086, 80186, 80286, 80386, Pentium, Pentium with MMX, Pentium Pro, Pentium II, III and IV, and Celeron.

9.    The term "Intel Compatible PC" refers to a PC designed to function with Defendant Intel's x86 microprocessors.

10.    The term "AMD Compatible PC" refers to a PC designed to function with AMD's microprocessors.

11.    The term "OEM" refers to original equipment manufacturers such as Dell, Hewlett-Packard, International Business Machines, Sony, Fujitsu/Fujitsu Siemens, Toshiba, Acer and NEC.

12.    The term "Distributor(s)" refers to a company that markets or sells PCs.

13.    The term "Retailer(s)" refers to a company that buys PCs in large quantities from OEMs or Distributors, and then sells individual PCs to consumers.  Examples of Retailers include Circuit City and Best Buy.

## JURISDICTION AND VENUE

14.    This Complaint is filed, and these proceedings are instituted, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 (Section 2 of The Sherman Act (15 U.S.C. § 2)), to obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under state antitrust and consumer protection laws, and to recover the costs of suit,

including reasonable attorneys' fees, for the injuries that Plaintiff and all others similarly situated sustained as a result of the Defendant's violations of those laws.

15.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).    The Court has supplemental jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.    The Court also has diversity jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which, *inter alia*, amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, any member of a class of plaintiffs is a citizen of a State different from any defendant and the aggregated amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interests and costs.    28 U.S.C. §§ 1332(d)(2) and (6)

16.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendant Intel resides, transacts business, or is found within this District, and a substantial part of the events giving rise to the claims originated in this District.

17.    The activities of Defendant Intel and its co-conspirators, as described herein, are within the flow of, are intended to, and have a substantial effect on the interstate commerce of the United States.

18.    Jurisdiction of this Court for the pendent claims is authorized by Fed. R. Civ. P. 18(a).

## PARTIES

### A.    Plaintiff

19.    Paul C. Czysz("Plaintiff") is a resident of the County of Somerset in the State of New Jersey.    During the Class Period, Plaintiff purchased one or more Intel Compatible PCs containing Intel x86 microprocessors, for plaintiff's own use and not for resale, and has been injured by Defendant's and its co-conspirators' conduct, as alleged herein.

**B.    Defendant**

20.    Intel Corporation ("Intel") is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its office and principal place of business located at 2200 Mission College Boulevard, Santa Clara, California 95052.

**C.    Co-Conspirators**

21.    Certain PC OEMs, Distributors and Retailers not named Defendants in this Complaint have participated as unwilling co-conspirators in the alleged violations, and have performed acts and made statements in furtherance of the violations.  Various other persons, firms, and corporations, the identities of which are presently unknown have participated as co-conspirators with Defendant Intel in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Fed. R. Civ. P. 23(b)(2) and (3).  Plaintiff seeks to represent the following two Classes:

A.    All persons, sole proprietorships, partnerships, corporations and other entities residing in the United States who purchased x86 microprocessors or Intel Compatible PCS for their own use, and not for resale, at any time during the period of January 1, 1997 up to and including the date of the filing of this Complaint, or such later date as may be determined that Defendant has ceased its unlawful activities.

B.    All persons, sole proprietorships, partnerships, corporations and other entities residing in states that allow recovery under indirect purchaser statutes who purchased x86 microprocessors or Intel Compatible PCs for their own use, and not for resale, at any time during the period of January 1, 1997 up to and including the date of the filing of this Complaint, or such later date as may be determined that Defendant has ceased its unlawful activities.

Excluded from the Classes are the following: federal, state or local governmental entities; any judge, justice, or judicial officer presiding over this matter and the members of his or her immediate family; and Defendant and its co-conspirators, along with their respective parents, subsidiaries and/or affiliates.  Also excluded from this Class are the legal representatives, heirs, successors and attorneys of any

excluded person or entity, and any person acting on behalf of any excluded person or entity.

23.    All Class members are hereinafter referred to as the "Class." Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amending the Complaint.

24.    This action has been brought and may properly be maintained as a Class action, pursuant to the provisions of the Rule 23 of the Federal Rules of Civil Procedure.

25.    Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Class contains millions of members. The precise number of Class members is unknown to Plaintiff. The true number of Class members is likely to be known by Defendant, and thus, such Class members may be notified of the pendency of this action by published notice or other alternative means.

26.    Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include:

(i)     Whether Defendant's anticompetitive and monopolistic conduct violated the Sherman Act;

(ii)    Whether Defendant's anticompetitive and monopolistic conduct violated all other state antitrust, unfair competition, and competition laws that permit damage actions by indirect purchasers, including but not limited to:

1.     Alabama

2.     Arizona

3.     California

4.     District of Columbia

5.     Florida

6

6.          Iowa

7.          Kansas

8.          Maine

9.          Michigan

10.         Minnesota

11.         Mississippi

12.         Nebraska

13.         Nevada

14.         New Mexico

15.         New York

16.         North Carolina

17.         North Dakota

18.         Ohio

19.         South Dakota

20.         Tennessee

21.         Vermont

22.         West Virginia

23.         Wisconsin

(iii)   Whether Defendant possesses monopoly power in the relevant market;

(iv)   Whether Defendant's conduct caused injury to the Class by increasing, maintaining or stabilizing the prices of x86 microprocessors and of Intel Compatible PCs above competitive levels;

(v)    Whether Defendant acquired or maintained monopoly power within the relevant market by unlawful and/or anticompetitive conduct;

(vi)   Whether Defendant's conduct caused injury to the business or

property of Plaintiff and the members of the Class and, if so, the appropriate class wide measure of damages;

(vii)   The operative time period during which Defendant engaged in conduct violative of the Sherman Act, the common law of monopolization and/or other indirect purchaser state statutes; and

(viii)  Whether the Class is entitled to injunctive relief, and, if so, the nature and extent thereof.

27.     Plaintiff's claims are typical of those of the Class he represents because Plaintiff and all of the Class members were injured and continue to be injured and/or threatened with injury in the same manner by Defendants' unlawful, anti-competitive and inequitable methods, acts and practices, *i.e.*, they have paid and continue to pay supra-competitive prices and will continue to be forced to do so until the Relevant Market is truly competitive and prices have stabilized to competitive levels.

28.     Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel who are experienced in antitrust and consumer class action litigation.  Plaintiff has no interests which are adverse to, or in conflict with, other members of the Class.

29.     The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

31.     In addition, Defendants have acted and refused to act, as alleged herein, on grounds generally applicable to the Class.

8

32.   In the absence of a class action, Defendant would be unjustly enriched because it would be able to retain the benefits and fruits of its wrongful conduct.

## FACTUAL BACKGROUND

**A.     Introduction**

33.   Intel designs, develops, manufactures, markets, and sells a variety of semiconductor products, including microprocessors.  Microprocessors are often described as the "brains" of a PC system, because it serves the essential functions of processing system data and controlling other devices integral to the system.

34.   Intel has illegally maintained its x86 microprocessor market monopoly by a variety of exclusionary practices that foreclose effective competition and market penetration by competitors such as AMD and others.  Intel's exclusionary practices include direct payments to Distributors and Retailers in return for exclusive or near-exclusive supply arrangements; discriminatory rebates, discounts and subsidies to customers that  foreclose competitors, including AMD, from gaining sufficient market share to compete effectively; threats of economic retaliation against customers who deal with or support AMD; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.

35.   Intel's exclusionary practices are targeted at both U.S. and foreign customers.  The purpose and effect of the illegal conduct is to maintain Intel's monopoly market share by preventing competitors from making significant gains in sales, output and market share worldwide and thereby further entrenching the dependence of x86 microprocessor consumers on Intel for the overwhelming majority of their processor needs.

36.   Intel has obtained exclusive or near-exclusive supply arrangements with a number of large OEM PC manufacturers, including Dell, Sony, Toshiba, NEC, Fujitsu, Hitachi and Gateway. Pursuant to these arrangements, the OEMs purchase none or very little of their supply from AMD.   Intel has secured these arrangements by means of direct payments, favorable discriminatory pricing, promotional support, and other financial incentives.   In proceedings brought by the JFTC, Intel is not opposing the JFTC charges of misconduct with respect to Sony, Toshiba, NEC, Fujitsu and Hitachi.

37.    The relevant product market is x86 and compatible microprocessors.  The relevant geographic market is the world.

38.    At all material times, Intel has had worldwide monopoly power in the x86 microprocessor market.  Sales of Intel microprocessors have accounted for approximately 80 percent of the total dollar sales of microprocessors worldwide.

39.    Intel has abused its monopoly power and maintained it by means of unlawful and anticompetitive exclusionary business practices that force OEMs, Distributors, and Retailers to limit severely or cancel or abandon altogether beneficial relationships with Intel's competitors, including AMD.  This causes the price of x86 microprocessors and of Intel Compatible PCs to increase, stabilize and remain at supra-competitive levels.

**B.    Japanese Federal Trade Proceeding**

40.    On March 8, 2005, the JFTC ruled that Intel had violated Japan's antimonopoly laws.  The JFTC complaint alleged that Intel had violated these laws by offering discounts to five Japanese PC vendors - Hitachi Ltd., Sony Corp., Fujitsu Ltd., Toshiba Corp., and NEC Corp. - on the condition that they either use Intel microprocessors exclusively, or limit the use of competitors' chips to 10%.

41.    Japanese regulators found that Intel violated Japanese antitrust laws beginning in 2002.  In Japan, Intel's market share of x86 microprocessors jumped from 78% in 2002 to 90% in 2004, while the shares of its competitors, AMD and Transmeta, dropped respectively from 18% in 2002 to 8% in 2004 and from 24% in 2002 to 11% in 2003.  According to Japanese regulators, who believed Intel's sales methods to be unfair, the discount stipulations asserted by Intel to its OEMs severely limited PC companies' purchases from Intel's rivals.  The JFTC discovered that in one case, Intel forced a PC maker to buy all of its semiconductors from them, under threat that otherwise it would lose the rebates that Intel had offered.

42.    Under the March 8, 2005 ruling, Intel can no longer require customers to use its chips exclusively or nearly exclusively across product cycles that typically span three or four months.  Due to the ruling, OEMs will not be allowed to commit to exclusive use of Intel's

microprocessors even of its own volition.  Rather, Intel now must bid for each cycle.  Intel is still able to utilize volume discounts as incentives to PC makers, but it cannot make the dissemination of a discount conditional on a promise of exclusivity by the purchaser.  Although Intel accepted the Commission's recommendation, it did not purport to agree with the facts underlying the allegations.

**C.    Unlawful Practices Directed At Distributors**

43.    Intel utilizes many of the same anticompetitive tactics with Distributors as it does with OEMs.  For example, Intel entered into an exclusive deal with Synnex, which is one of the largest U.S. based Distributors.  Intel offered other Distributors a smorgasbord of programs, including but not limited to marketing bonuses, increased rebates, credit programs, payment for freight charges and special inventory assistance such as credits to offset inventory costs, if they agreed to carry only Intel microprocessors.

44.    Intel also provides discounts and rebates to Distributors on the condition that they cease to do business with competitors, such as AMD, on both a worldwide or strategic sub-market basis.  For example, upon information and belief, in December 2004, Ingram Micro, Intel's biggest Distributor in China, unexpectedly ended discussions to distribute AMD microprocessors because Intel provided loyalty rebates that were more lucrative than distributing AMD's microprocessors.

45.    Similar to its dealings with OEMs, Intel offers retroactive rebates when a Distributor reaches a prescribed buying quota.

46.    Intel's institution of exclusivity agreements, rebate programs and enforcing quotas is anticompetitive and unlawful behavior which leads to supra-competitive prices on Intel Compatible PCs harming the Plaintiff and the Class.

**D.    Unlawful Practices Directed At Retailers**

47.    Approximately 20% of all desktop and notebook PCs are purchased at retail stores. Examples of Retailers include Best Buy, Circuit City, Walmart/Sams Club, Staples, Office Depot and Office Max.

48.    Intel and other manufacturers of microprocessors face a two-step process to get their microprocessors on retail shelves:

> i.    First, they must convince one or more OEMs to build machines using their microprocessor at a suggested price point; and

> ii.    Second, they must convince the Retailer to stock and devote shelf space to these machines.

49.    In exchange for providing shelf space, Retailers demand market development funds ("MDF"). The MDF required to secure shelf space can run as high as $25 per box depending on the PC price point and how urgently the microprocessor manufacturer wants the shelf space. Additionally, MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a microprocessor manufacturer must buy for thousands of dollars. For example, it may include space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff.

50.    Intel has historically enjoyed an advantage over its competitors at retail because of many of the strategies described herein. Intel has greater access to the OEMs' price points and the ability to exert pressure to keep its competitors out of the OEM's product plans.

51.    To leverage those advantages, Intel has also made exclusive deals with many key Retailers. For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would

be put at risk.  In another example, when Intel learned that Fry's, Fujitsu's only Retailer in the United States, was very successfully marketing a Fujitsu AMD Compatible PC, it offered Fry's a large payment to remove the product from its shelves.

52.   As soon as AMD made some progress in gaining retail market share[1], Intel instituted a rebate program similar to what was given to OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to Retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending Retailer's marketing support from Intel is cut by 33% *across all products*.

53.   More specifically, if less than 20% of Circuit City's notebook computer revenue derives from AMD Compatible PCs (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel Compatible PCs sold; but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10.  This creates a $5 per box "tax" on the Retailer for doing 20% or more of its dollar volume with AMD Compatible PCs; and this "tax" is applicable to all of the Intel Compatible PCs that the Retailer buys, back to the very first machine.

54.   As with OEMs and Distributors, Intel's agreements and relationships with Retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly to the detriment of the Plaintiff and the Class.

---

[1]  With regard to the desktop market during the fourth quarter of 2004, AMD Compatible PCs captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves.  And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD PCs accounted for roughly 30% and 22% of their sales, respectively.

## FRAUDULENT CONCEALMENT

55.    Throughout the conspiracy, Defendant and its unwilling co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff and Class Members. Defendant and its unwilling co-conspirators conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendant and its unwilling co-conspirators were violating the antitrust laws as alleged herein until AMD's action against Intel was commenced in June 2005.

56.    As a result of the active concealment of the conspiracy by Defendant and its co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## COUNT I

### For Declaratory and Injunctive Relief Under Section 16 of The Clayton Act and 18 U.S.C. § 2201(a) For Violations of Section 1 of The Sherman Act (15 U.S.C. § 1) [The Sherman Act]

57.    Plaintiff re-alleges and incorporates each and every allegations set forth in the paragraphs above.

58.    Beginning at a time presently unknown to Plaintiff, but at least as early as January 1, 1997, and continuing through at least the filing of this Complaint, Defendant and its co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices in the worldwide x86 microprocessor market.

59.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendant and its co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A.    To fix, raise, maintain and/or stabilize the price of x86 microprocessors;

14

    B. To limit competition and exclude AMD's microprocessors from the marketplace by:

      i. severely restricting or abolishing relationships with AMD;

      ii. entering into exclusive or near-exclusive contracts to the detriment of AMD; and

      iii. entering into exclusionary rebate programs to the detriment of AMD.

60.    The combination and conspiracy alleged herein has had the following effects, among others:

    A. Price competition in the x86 microprocessors market has been restrained, suppressed, and/or eliminated;

    B. Prices for x86 microprocessors sold by Defendant have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels worldwide; and

    C. Those who purchased x86 microprocessors directly and indirectly from Defendant have been deprived of the benefits of free and open competition.

61.    Plaintiff has been injured and will continue to be injured in their business and property by paying more for x86 microprocessors purchased indirectly from the Defendant and its co-conspirators than he would have paid and will pay in the absence of the combination and conspiracy, including paying more for personal computers and other products in which x86 microprocessors area a component as a result of higher prices paid for x86 microprocessors by the OEMs of those products.

62.    Plaintiff and the Class continue to be injured by Defendant's continuing conduct in violation of Section 1 of the Sherman Act.

63.    Plaintiff and the members of the Class request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 18 U.S.C. § 2201(a), that Defendant's aforementioned conduct violates Section 1 of the Sherman Act.

64. Plaintiff and the members of the Class also request that the Court enjoin and restrain Defendant's wrongful conduct, alleged herein, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT II

**For Declaratory and Injunctive Relief Under Section 16 of The Clayton Act and
18 U.S.C. § 2201(a) For Violations of Section 2 of The Sherman Act (15 U.S.C. § 2)
[The Sherman Act]**

65. Plaintiff re-alleges and incorporates each and every allegations set forth in the paragraphs above.

66. As described above, Defendant knowingly and willfully engaged in a course of unlawful and anticompetitive conduct to acquire and/or maintain its monopoly power in the worldwide x86 microprocessor market.

67. Through its wrongful course of conduct, Intel obtained, maintained, and continues to maintain, unlawful monopoly power, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

68. Through such course of conduct, Intel exercised its monopoly power and caused anticompetitive effects, namely: suppression of the development of cheaper, faster, alternative microprocessors for the production of personal and business PCs; and increasing the costs to the Plaintiff and the Class of purchasing Intel Compatible PCs.

69. Plaintiff and the Class have been injured by Defendant's conduct, in that they have paid supra-competitive prices for x86 microprocessors and for Intel Compatible PCs, and have been denied the benefit of free and open competition in the market for technology employed in the production and supply of microprocessors.

70. Plaintiff and the Class continue to be injured by Defendant's continuing conduct in violation of Section 2 of the Sherman Act.

71. Plaintiff and the members of the Class request a declaratory judgment, pursuant to Fed. R. Civ. P. 57 and 18 U.S.C. § 2201(a), that Defendant's aforementioned conduct violates Section 2 of the Sherman Act.

72.    Plaintiff and the members of the Class also request that the Court enjoin and restrain Defendant's wrongful conduct, alleged herein, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT III

### [Violations of State Antitrust and Unfair Competition Laws]

73.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegations set forth in the preceding paragraphs of this Complaint.

74.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violations of Alabama Code §§ 8-10-1 *et seq.*

75.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violations of Arizona Revised Stat. Code §§ 44-1401 *et seq.*

76.    By reason of the foregoing, Defendant has entered into agreements in restraingt of trade in violation of California Bus. & Prof. §§ 16700 *et seq.* and Cal. Bus. & Prof. Code §§ 17200 *et seq.*

77.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violations of District of Columbia Code Ann. §§ 28-4503 *et seq.*

78.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violations of Florida Stat. §§ 501.201 *et seq.*

79.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 *et seq.*

80.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101 *et seq.*

81.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101 *et seq.*

82.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Michigan Comp. Laws. Ann §§ 445.773 *et seq.*

83.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.52 *et seq.*

84.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75.21.1 *et seq.*

85.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Nebraska Rev. Stat. §§ 59.801 *et seq.*

86.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

87.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

88.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violations of New York Gen. Bus. Law §§ 340, 349 *et seq.*

89.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

90.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

91.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Ohio Rev. Code Ann. §§ 1331.01 *et seq.*

92.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Pennsylvania common law.

93.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

94.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*

95.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.*

96.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1 *et seq.*

97.    By reason of the foregoing, Defendant has entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01 *et seq.*

98.    Class members in each of the states listed above paid supra-competitive prices for x86 microprocessors and as a result have been injured because Defendant's wrongful and monopolistic conduct.

**WHEREFORE**, Plaintiff prays that:

(a)    the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiff's claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages; and declare Plaintiff as representative of the Class;

(b)    the conduct alleged herein be declared, adjudged and decreed to be in violation of Sections 1 and 2 of the Sherman Act, of the statutes of the Indirect Purchaser States set forth above, and the common law of unjust enrichment;

(c)    Plaintiff and each member of the Class be awarded damages and, where applicable, treble, multiple, and other damages, according to the laws of the Indirect Purchaser States, including interest;

(d)    Plaintiff and each member of the Class recover the amounts by which Defendants have been unjustly enriched;

(e)    Defendant be enjoined from continuing the illegal activities alleged herein;

(f)    Plaintiff and the Class recover their costs of suit, including reasonable attorneys' fees and expenses as provided by law;

(g)    Plaintiff and the Class be granted such other and further as the Court deems just and necessary.

## DEMAND FOR JURY TRIAL

Plaintiff and the members of the Class hereby demand trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.


Dated: July 20, 2005

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4439)
P.O. Box 1035
One Rodney Square
Wilmington, DE 19899
Tel: 302-656-2500
Fax: 302-656-9053

Counsel for Plaintiff


Of Counsel:

Michael D. Gottsch
Daniel B. Scott
CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
(610) 642-8500